UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

LAKISHIA N. BOYD,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        No.:   3:20-cv-321-TAV-DCP
                                     )
YOUTH OPPORTUNITY                    )
INVESTMENTS, LLC,                    )
                                     )
            Defendant.               )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on defendant's motion for partial summary judgment [Doc. 50]. Plaintiff has responded [Doc. 58], and defendant has replied [Doc. 63]. Also before the Court is defendant's motion to bifurcate [Doc. 62]. These matters are now ripe for the Court's review. *See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, defendant's motion for partial summary judgment [Doc. 50] is **GRANTED in part and DENIED in part** and defendant's motion to bifurcate [Doc. 62] is **DENIED as moot**.

I.    **Background**

In her amended complaint, plaintiff raises claims of retaliatory discharge under state law, specifically, Tennessee Code Annotated Sections 33-2-401, *et seq.*, 37-1-410(b), 37-1-613, and Tennessee common law, or alternatively, the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304 [Doc. 35, p. 1].

Defendant Youth Opportunity Investments ("YOI") owns and manages clinical and educational rehabilitation campuses for at-risk youth, including the Roane Youth Academy

("Roane Academy") in Rockwood, Tennessee [Doc. 52, p. 3]. Plaintiff was hired at Roane Academy in August 2018 as a pro re nata ("PRN") youth care specialist [*Id.* at 4, 239]. Youth care specialists supervise the youth residents during waking and non-waking hours [*Id.* at 4]. Because she was employed as PRN status, defendant would either notify plaintiff to come in or plaintiff would call to get availability for work [*Id.* at 239].

Plaintiff had several relatives who also worked at Roane Academy, including her nephew, Desmond Moore [*Id.* at 240–41]. On or about August 26, 2019, Moore was terminated from YOI for hitting a youth during a riot [*Id.* at 241]. At the time, Casey Jenkins, another Roane Academy employee, was dating Moore, and ultimately obtained a lawyer to represent Moore [*Id.* at 253]. After Moore's termination, plaintiff began contacting Roane Academy's Human Resources Supervisor, Lauren Turpin, regarding Moore's personnel files, including training, PTO, and pay grade related paperwork [*Id.* at 241]. Ultimately, Turpin told plaintiff that Moore would need to call on his own behalf [*Id.*]. Plaintiff last worked at Roane Academy on August 27, 2019, around the time of Moore's termination [*Id.* at 4].

## A. Plaintiff's Complaints

On September 9, 2019, plaintiff e-mailed Tyrene Green, the Vice President of Program Development for YOI with a list of numerous complaints including that Roane Academy was understaffed, out of compliance with Department of Children's Services ("DCS") requirements, lacked proper training, appropriate breaks, and professionalism, and engaged in HIPPA violations [Doc. 52, pp. 269–71, 277]. Plaintiff specifically related

2

several complaints about the training and work conditions Moore had experienced at Roane Academy and attempted to explain the situation that led to Moore's termination [*Id.* at 269–70]. Plaintiff also detailed issues related to Turpin's handling of Moore's employment paperwork [*Id.* at 270–71]. Plaintiff concluded by stating that Moore had an upcoming appointment with an attorney and intended to "press charges" against Roane Academy and YOI [*Id.* at 269–71].

Plaintiff attached several documents to her e-mail, including a letter from a former employee, Jamal Ashley [*Id.* at 273–74]. Ashley stated that he had witnessed numerous violations of YOI and DCS policy, including staff having sexual intercourse with the children or staff having romantic relationships among themselves that interfered with work performance [*Id.* at 273].[1] Ashley further related complaints regarding working conditions at Roane Academy [*Id.* at 273–74].

On September 12, plaintiff e-mailed Green to follow up on her complaint, asking if it had been submitted to the corporate office for investigation [Doc. 58-9, p. 2]. Plaintiff also forwarded her September 9, e-mail to Dallas Scott, Vice President of Programs at YOI [*Id.*]. The same day, plaintiff notified DCS of everything that was in her complaint to YOI [Doc. 52, p. 248]. She initially called anonymously, but, after being informed that it was difficult to investigate anonymous calls, she called again and provided her name [*Id.* at 249].

---

[1] Plaintiff's e-mail itself did not specifically mention any allegations of sexual misconduct [Doc. 52, pp. 269–71].

3

On September 13, 2019, plaintiff emailed Turpin that she was "using the open door policy" and proceeded to raise several concerns regarding Turpin's handling of Moore's employment paperwork [*Id.* at 279–80].[2]  A series of e-mails about Moore's employment paperwork followed [*Id.* at 278–79].  Green, who had been copied on the e-mail chain, responded to plaintiff stating that he had received her e-mailed complaints and had attempted to call her earlier in the week to discuss [*Id.* at 278].  Green asked plaintiff to provide a date and time that they could talk [*Id.*].  Plaintiff responded with her phone number [*Id.* at 277].

That same day, Green e-mailed plaintiff about a previously scheduled meeting regarding her complaints that had been cancelled [*Id.*].  Green stated that he was "extremely interested in discussing [plaintiff's] concerns" and again inquired about a date and time to discuss.  Plaintiff responded that she would let Green know of a specific time via e-mail on September 17.  She stated "[a]fter informing our legal team, we have been counseled to hold off on having a formal meeting with you due to the severity and magnitude of the complaints" but stated that she would follow-up via e-mail "to let you know if our meeting will proceed and we can convene at a time discussed" [*Id.*].

On September 19, Green e-mailed plaintiff that he had not received any further correspondence from her and understood that she may or may not be able to respond per the advisement of her "legal team" [*Id.* at 281].  However, Green stated that he was

---

[2]  The YOI Employee Manual had an "Open Door Policy" which stated: "No employee, regardless of the nature of his/her concern/suggestion/question, will be penalized for using the Open Door Policy."  [Doc. 52, p. 298].

4

"interested and available to speak with [plaintiff] at a later date if [she] would like." Green also inquired about plaintiff's desire to remain on PRN status, in light of the fact that her "legal team" had advised her not to have further contact with YOI [*Id.*]. Plaintiff admits that she did not respond to Green's question about her PRN status, explaining that she "didn't understand why [she] was being asked that question . . . when all [she] was doing was filing a complaint" and she "didn't suggest quitting whatsoever" [*Id.* at 256]. Plaintiff further explained that she did not respond to Green's e-mail at that time because she "wanted to think the rest of this through before" she responded [*Id.*].

Plaintiff testified that, although she did not respond to Green's e-mail about continuing to provide PRN services at Roane Academy, she "had been contacting the facility to keep going back to work, and nobody was answering the phone" [*Id.* at 256]. Roane Academy's phone records from January 2018 to mid-May 2021 show that plaintiff only placed three calls to Roane Academy's main phone line in that time frame [*Id.* at 4]. All of these calls occurred on August 28, 2019, and occurred within a 2-minute span [*Id.* at 4, 214].

Plaintiff also explained that Jenkins had previously advised her not to "talk to Mr. Green alone, [but] that [she] should talk to someone higher and not alone because Mr. Green had a habit of turning the truth into false" [*Id.* at 242]. As a result, plaintiff "wanted to keep everything via e-mail" [*Id.*]. However, plaintiff admitted she never shared this concern with Green [*Id.* at 255].

Green testified that, after receiving plaintiff's complaint, he talked to several staff members about the matter [*Id.* at 326]. Green also attempted to contact Ashley about the letter that was attached to plaintiff's complaint [*Id.* at 327]. Green stated that he realized he could not complete a full investigation after several failed attempts at contacting plaintiff and her statement that she had been advised by legal counsel not to speak to him [*Id.* at 329]. Nevertheless, Green continued to investigate plaintiff's complaints, but did not find any information beyond general employee complaints [*Id.*].

Plaintiff's next e-mail was a response to Green on October 30, 2019, asking for the corporate telephone number and the direct human resources supervisor [*Id.* at 281]. Green forwarded this e-mail to Lindsey Ford, the Director of Legal Operations for YOI, on November 7, stating that it was his "third attempt to resolve this issue with Ms. Boyd but she never calls or reschedules" [*Id.* at 3, 281]. He stated that he "responded on the 19th of Sept[ember] and didn't hear back from her until the 30 as she advised me she could [no]t talk to me under the advisement of her 'legal team'" [*Id.* at 281].

### B.    Plaintiff's Interactions with Legal Department and Termination

On October 30, 2019, shortly after her e-mail to Green, plaintiff e-mailed Turpin asking about training to maintain her PRN status [Doc. 58-3, p. 13; Doc. 58-10, p. 2]. However, plaintiff stated that she did "not feel safe to come back to work due to the retaliation and unanswered questions of [her] complaint . . . until this is rectified and explained by upper management via a written document" and asked "how can YOI make provisions for [her training] due to the severity of [her] complaint" [Doc. 58-10, p. 2].

6

Later that day, Green responded, stating that he had directed plaintiff's inquiry to Ford, and instructing plaintiff to "direct all of [her] inquiries to [Ford] moving forward or until informed other wise [sic]." [Doc. 52, p. 297; Doc. 58-10, p. 2].

Plaintiff e-mailed Ford, asking for a response to her questions regarding training and her official complaint, and Ford responded that she would be happy to call to discuss [Doc. 52, p. 297]. Plaintiff responded that she preferred to communicate via e-mail and asked whether Ford had received her complaint [*Id.* at 296]. In response, Ford asked whether plaintiff had retained an attorney [*Id.* at 295–96]. On October 31, plaintiff responded stating "I'm not sure why I'm being asked if I have an attorney. I'm just trying to communicate with upper management about my concerns that seems to be ignored for the past months" [*Id.* at 294]. Plaintiff also stated that she had tried to contact Turpin about keeping her training current and how YOI would assist her to avoid retaliation but did not receive a response [*Id.*]. Plaintiff also raised various other complaints and stated that she "need[ed] the work badly but with all of the complaints, stabbing, fighting[,] understaff[ing], and fear of retaliation, I reached out as an employee supposed to and I'm being treated unfairly and ignored" [*Id.* at 295].

Ford responded by providing plaintiff with a copy of the YOI handbook and stated that she had reached out to the compliance team about any training requirements for maintaining a PRN status and would provide that information to plaintiff [*Id.* at 293]. Plaintiff again asked whether an investigation has taken place and whether she would receive a written response to her complaints [*Id.* at 292]. Ford responded that, from their

communications, there were only two issues that directly related to plaintiff, which were questions regarding policies and procedures and questions about training, both of which Ford had addressed [*Id.*]. Plaintiff responded that she was "in fear of being treated poorly and being retaliated against" and "wanted to know what accommodates [sic] can YOI provide me with my PRN position to keep this from happening" [*Id.* at 291]. Plaintiff again asked whether an investigation had taken place and whether she would receive a written response [*Id.*]. Plaintiff explained in her deposition that she believed she had been retaliated against because her phone calls were being ignored while she was attempting to return to work [*Id.* at 263; Doc. 63-1, p. 6].

On November 1, 2019, Ford informed plaintiff that she had missed several training sessions for her PRN status, but accommodations could be made to bring her current [Doc. 52, p. 290]. On November 5, Plaintiff e-mailed Ford asking for a training schedule and the days she could work [*Id.* at 289]. Plaintiff followed up stating that she was "very fearful to return without knowing I want [sic] be retaliated against for filing a complaint and a DCS claim" [*Id.* at 288]. The next day, plaintiff sent several e-mails to Ford to question why she had been sent to the legal department and how it was possible that she had missed several training sessions [*Id.*]. On November 7, Ford responded that she had already addressed all of plaintiff's concerns [*Id.* at 287]. Plaintiff responded that her questions had not been answered and again asked for a training and work schedule and expressed fear of retaliation if she returned to work [*Id.* at 309].

8

After this e-mail, Gary Sallee, Chief Legal Officer for YOI, who had been copied on the prior e-mails between plaintiff and Ford, responded that he was "inserting [him]self into this discussion" and asked if there was a time he could talk to plaintiff [*Id.* at 228, 309]. Sallee also asked plaintiff to "give some thought as to whether you are still interested in employment with YOI and still passionate about doing the work we do with and for youth" [*Id.* at 309]. Plaintiff then sent Sallee a lengthy e-mail, stating "I currently do not feel safe to come back to work at Roane Academy due to fear of retaliation and not receiving clarity to the unanswered questions of my complaint I submitted on 9/9/19 until this is rectified and explained by upper management via a written document" [*Id.* at 306]. Defendant again reiterated her complaints and questioned whether an investigation had occurred [*Id.*]. Plaintiff also stated that she "would love to come back PRN or part time in clinical, helping with the documentation working from home" and stated that she hoped working with clinical "is still an option because I can't endure the conditions that's going on now without the help of senior management" [*Id.* at 308].[3]

On November 11, plaintiff sent another e-mail to Sallee, reiterating her complaints about breaks while on duty [*Id.* at 305]. That day, Sallee responded that the executive team in operations had advised him that each of plaintiff's complaints had been "fully investigated, unsubstantiated, and explained to [her]." Sallee further stated "[i]t seems to me that you are not interested in working for YOI unless you have special accommodations

---

[3] In late August 2019, plaintiff had asked for her position to be changed to involve working with Jenkins in clinical, and for that position to be at least partially remote [Doc. 52, pp. 245, 261]. However, this request was not approved [*Id.* at 261].

9

based on unreasonable fear" and recommended that plaintiff "find employment elsewhere." Sallee further advised that, if she wished to take part in YOI's training, it was incumbent on her to make herself available, contingent on the facility administrator wanting her to remain eligible for further duty on a PRN status. He also suggested plaintiff contact the facility administrator to assure those relying on her that she was committed to the job and would like to receive training at the next opportunity [*Id.*].

Plaintiff responded that she had never been advised that her complaint was fully investigated [*Id.* at 304]. She stated that her fear was reasonable because current employees told her that upper management did not want her at the facility.[4] She then stated that she would "go forward with [her] legal team on the discrimination [she] ha[d] received for blowing the whistle." Approximately 40 minutes later, plaintiff e-mailed Sallee, asking "since I am an active employee and I am not able to get a response from Roane Academy management, do I need to take this as a termination of my employment with YOI" [*Id.*].

On November 12, Sallee e-mailed plaintiff to inform her that her "services as a PRN employee w[ould] no longer be required by the company" and offer her a severance package for a mutual release of claims [*Id.* at 311]. Plaintiff inquired about the reason for

---

[4] In her deposition, Turpin testified that, at some point in the Fall of 2019, before plaintiff's termination, she was instructed not to schedule plaintiff, and, if plaintiff came to Roane Academy looking for work, to tell plaintiff that she was not needed [Doc. 58-5, p. 10]. Similarly, Teresa McClain, another Roane Academy employee, stated that she was never given any explanation regarding why plaintiff no longer worked at Roane Academy, but was informed by "whoever [she] asked" that plaintiff was not coming back [Doc. 58-6, p. 5]. However, McClain did not provide a timeline for when she was informed plaintiff was not returning to Roane Academy [*Id.*].

10

her termination, and Sallee responded that "[t]he company feels it is the best decision for providing best-in-class services to its customers and the youth in its care and custody" [*Id.*].

In the course of this litigation, Sallee provided additional explanations for plaintiff's termination. In an interrogatory response, Sallee stated "[p]laintiff's employment was terminated because after her multiple of complaints and grievances were investigated and found to be without merit, she refused to accept this determination and continued to lodge baseless complaints in a combative manner" [Doc. 58-1, p. 3]. Additionally, in a declaration, Sallee stated that plaintiff's employment was terminated for several reasons, including: (1) plaintiff's "refus[al] to communicate with [Green] about the investigation into her alleged concerns"; (2) plaintiff's failure to "respond[] to [] Green's inquiry about whether she wished to continue providing PRN service at Roane Academy"; (3) plaintiff's failure to "consult the Facility Administrator about training and returning to work" after being advised to do so; and (4) Jenkins's written statement regarding plaintiff's sending inappropriate and threatening messages including confidential information[5] [Doc. 52, pp. 228–29]. Further, in his deposition, Sallee stated that plaintiff was terminated because "[e]very effort was made at several levels of our company to accommodate her request to come back to work . . . [a]nd she elected not to come back to work, because she wanted to create her own rules, her own job. . . . She refused training. She refused to return phone calls. And it came to the point where it was obvious to us she was preparing for a lawsuit" [*Id.* at 345]. Sallee also stated that competent and satisfactory employees participate in

---

[5] The Court sets forth the facts related to the Jenkins Complaint with further detail below.

11

company investigations when asked to do so, and such would be important to YOI for providing best-in-class service [*Id.* at 346].

### C. Jenkins's Complaint Regarding Plaintiff

While plaintiff's discussions with legal were ongoing, between November 4 and November 15, 2019, plaintiff sent Jenkins a series of expletive-laced text messages, threatening to "tell on [her] ass" and "send all [her] shit to corporate" [Doc. 52, pp. 206–12]. Plaintiff told Jenkins: "I'm gona [sic] wow you since you in everything. You will be in it all" [*Id.* at 209]. Plaintiff also sent Jenkins a photo and stated "This goes against the policy sending pictures of kids. I'm sending all your text to corporate and Anthony. He's on to your ass fat bitch" [*Id.* at 212].

On November 5, Jenkins filled a written statement form with YOI regarding the text messages she received from plaintiff [*Id.* at 339–40]. Jenkins stated that she and plaintiff had been professional friends, but plaintiff had sent her "threatening and inappropriate text messages" as well as a screenshot of information from Jenkins's computer [*Id.*]. Jenkins also stated that plaintiff told her she had an "inside source with DCS" and was going to "out Roane Academy" [*Id.* at 340]. Jenkins attached two screenshots of text messages to her written statement, including a photo message that appears to contain a screenshot of a computer screen [*Id.* at 341–42].

Turpin testified that Jenkins came to her to inform her about the situation with plaintiff, and Turpin asked her to write down everything that happened on a written statement form [*Id.* at 350]. Turpin stated that Jenkins wanted to "clear her name" with

regard to any accusation that she was sharing information about youth in Roane Academy's care.  After Jenkins completed a report about the messages from plaintiff, Turpin contacted Ford about the matter, and Turpin remembered conversations back and forth about it, but did not recall any specific follow-up [*Id.*].  In her declaration, Ford stated that Turpin provided her a copy of Jenkins's written statement on or about November 5 and Ford discussed it with Sallee on or about November 6 or 7 [*Id.* at 5].

### D. Offer of Reinstatement and Recension of Offer

On June 9, 2020, defendant offered plaintiff an opportunity to return to Roane Academy as a PRN youth care specialist, in part, due to staffing shortages [Doc. 52, pp. 5, 229, 322].  However, during the rehire process, YOI learned that, during her initial employment, plaintiff had allegedly misrepresented her criminal history [*Id.* at 229].

YOI ultimately rescinded its offer of employment based on plaintiff's prior misrepresentations to the company [*Id.* at 215].  In its recension letter, defendant explained that, during her initial employment, plaintiff was asked to provide more information regarding her criminal history, and on August 3, 2018, she authored a letter explaining her criminal history.  In the first paragraph, she wrote that she was a minor in 1997 and 1999, which was false, as she was 21 in 1997, and 23 in 1999.  Moreover, she did not explain a 1999 theft charge in Anderson County, Tennessee [*Id.*].

According to Ford, plaintiff did not submit an updated letter explaining her criminal charges during the rehire process [*Id.* at 5].  However, during the rehire process Ford obtained the warrant related to the 1999 criminal charge for theft in Anderson County, and

plaintiff had not offered any explanation for this charge in her original letter [*Id.*]. Sallee stated that he did not learn of these misrepresentations until YOI was working on plaintiff's reinstatement, and had YOI known about the inaccuracies in 2018, it would not have hired plaintiff then [*Id.* at 229].

Plaintiff now explains that, while she was not under the age of 18 in 1997 or 1999, it had been a "mistake" to write that she was a minor, and she should not have "used the word minor because of the legal term" [*Id.* at 266]. She also stated that she did not have the dates for the criminal charges when she wrote the letter, and Turpin wrote the dates in at a later date, but plaintiff "assumed [she] was a minor" at the time of those charges "because it was so far in the past, but I did not know the dates and just assumed so" [Doc. 58-8, p. 3]. Plaintiff also admits that she did not describe anything about the Anderson County charge in her 2018 letter, and states that her letter only covered the specific topics Turpin asked her to address [Doc. 52, p. 266].

## II.     Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *McLean v. 988011 Ontario Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). As such, the moving party has the burden of conclusively showing the lack of any genuine issue of material fact. *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). To successfully

14

oppose a motion for summary judgment, "[t]he non-moving party . . . must present sufficient evidence from which a jury could reasonably find for h[er]." *Jones v. Muskegon Cnty*., 625 F.3d 935, 940 (6th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 252 (1986)).

## III. Analysis

### A. TPPA Claim

The TPPA provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). The TPPA was intended to provide statutory protection to employees whose actions served to deter, expose, and stop organizational wrongdoing, and essentially codified the common-law cause of action for retaliatory discharge. *Williams v. City of Burns*, 465 S.W.3d 96, 109–10 (Tenn. 2015). For a plaintiff to maintain a TPPA claim, the plaintiff must show: (1) an at-will employment relationship existed; (2) the employee was terminated; (3) the employee was terminated because the employee attempted to exercise a statutory or constitutional right, or for any other reasons that violate public policy; and (4) the plaintiff's whistleblowing activity was the sole cause of the termination. *Treadaway v. Big Red Powersports, LLC*, 611 F. Supp. 2d 768, 783 (E.D. Tenn. 2009). To prove a claim under the TPPA, plaintiff must establish that retaliation was defendant's sole motivation for discharging her, and therefore, even if direct evidence establishes that retaliation was a substantial motivating factor, that does not end the inquiry. *Williams*, 465 S.W.3d at 113, n.16.

15

Section 50-1-304(g) sets forth a statutory burden-shifting framework to be applied to TPPA claims, for purposes of both summary judgment and trial. *Id.* at 112, n.15. This analytical framework is "virtually indistinguishable" from the familiar *McDonnell Douglas*[6] burden-shifting framework. *Id.*

Under this framework, plaintiff first bears the burden of proving a prima facie case under the TPPA, and, if she does so, she creates a rebuttable presumption that her employer unlawfully retaliated against her. *Id.* at 112 (quoting *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 780–81 (Tenn. 2010)). If plaintiff establishes a prima facie case under the TPPA, based on either direct or circumstantial evidence, the burden shifts to the defendant to come forward with a legitimate, non-retaliatory reason for its actions. *Smith v. C.R. Bard, Inc.*, 730 F. Supp. 2d 783, 797 (M.D. Tenn. 2010). If defendant articulates a legitimate, non-retaliatory reason for its discharge of plaintiff, the burden shifts back to plaintiff to show that the proffered reasons are pretextual or not worthy of belief. *Id.*

### 1. Prima Facie Case

Defendant first argues that plaintiff cannot establish a prima facie claim under the TPPA, because she cannot show that her complaints were the sole reason she was terminated; instead, she was terminated because it was apparent that she did not wish to return to work [Doc. 53, p. 17].

Plaintiff responds that defendant does not contest the first three elements of the prima facie requirements [Doc. 58, p. 10]. Plaintiff contends that she has direct evidence

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

16

of retaliatory motive, namely, Sallee's e-mail and interrogatory answer setting forth the reason for her termination [*Id.*]. She also contends that the fact that Sallee later changed his story about the reason for her termination is direct evidence of retaliatory motive [*Id.* at 11]. Plaintiff further points to the temporal proximity between her reports and her termination [*Id.* at 12]. Finally, she argues that she presented evidence of antagonism toward her in Turpin's testimony that plaintiff was not allowed to work and McClain's testimony that she was told plaintiff was not returning to Roane Academy [*Id.*].

Defendant contests plaintiff's claim that there is direct evidence of retaliatory motive [Doc. 63, p. 3]. Defendant argues that interrogatory response is not direct evidence of retaliatory motive because it does not state that plaintiff was terminated because she complained about illegal activities [*Id.*]. Defendant further contends that Green never told Turpin not to schedule plaintiff for work, but instead, told Turpin that if plaintiff showed up while issues were ongoing, to let her know that there was no work available [*Id.* at 4–5]. Moreover, defendant states that it is unclear from McClain's testimony whether she was told that plaintiff was not coming back before or after plaintiff's termination [*Id.* at 5].

The burden of establishing a prima face case is not onerous. *Williams*, 465 S.W. 3d at 113. To establish a prima facie claim of retaliation under the TPPA, a plaintiff "must demonstrate that [s]he engaged in conduct protected by the TPPA, that the protected conduct was known to the defendant, that the defendant thereafter discharged h[er], and that there was the requisite causal connection between the protected conduct and the discharge." *Id.*

17

It does not appear that defendant challenges the first three elements of plaintiff's prima facie case—that she was engaged in protected conduct, defendant knew of that conduct, and defendant thereafter discharged plaintiff. The dispute here arises over the causal connection requirement. However, the Court notes that defendant's argument primarily centers on whether plaintiff has established that a retaliatory motive was defendant's *sole* motive for the discharge [*See* Doc. 53, p. 9]. But the Tennessee Supreme Court has made clear that plaintiff does not need to establish that a retaliatory motive is the "sole cause" of her termination at the prima facie stage. *See Williams*, 465 S.W.3d at 113, 115. Instead, she must show that there was a causal connection between the protected conduct and the discharge. *See id.*

Turning to plaintiff's assertion that direct evidence establishes that there was a causal connection between her protected activity and her discharge, "direct evidence is evidence which, if believed, 'requires the conclusion that unlawful [retaliation] was at least a motivating factor.'" *Bartlik v. U.S. Dep't of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). Regardless of the strength of evidence, it is not direct evidence of retaliation "if it admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact." *Gizzard v. Nashville Hosp. Capital, LLC*, No. 3:18-cv-34, 2021 WL 3269955, at *17 (M.D. Tenn. July 30, 2021) (quoting *Kocak v. Comm. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005)) (internal alterations omitted).

Next, plaintiff points to two pieces of evidence that she contends are direct evidence: Sallee's contemporaneous e-mail explaining the reason for her termination and his subsequent interrogatory response addressing the same. In his November 12 e-mail, Sallee informed plaintiff that her employment was being terminated because "[t]he company feels it is the best decision for providing best-in-class services to its customers and the youth in its care and custody" [Doc. 52, p. 311]. Additionally, in response to an interrogatory asking Sallee to list "each and every reason" for plaintiff's termination, Sallee responded that "[p]laintiff's employment was terminated because after her multitude of complaints and grievances were investigated and found to be without merit, she refused to accept this determination and continued to lodge baseless complaints in a combative manner" [Doc. 58-1, p. 3].

Neither of these statements are direct evidence of retaliatory motive. First, Sallee's explanation for plaintiff's termination in his November 12 e-mail makes no mention of any retaliation or plaintiff's lodging of complaints, but rather, contains a vague statement that plaintiff's termination is in the company's best interest [*See* Doc. 52, p. 311]. This statement certainly permits more than one plausible interpretation regarding the reason for plaintiff's termination. *See Gizzard*, 2021 WL 3269955, at *17. Indeed, Sallee's e-mail is not even circumstantial evidence of a causal connection, as nothing from the e-mailed explanation even implicates that the reason for plaintiff's termination was her filing of complaints. Instead, the e-mail simply contains a generalized statement that plaintiff's termination is related to ensuring the quality of the company's services.

19

Second, Sallee's interrogatory response, while it does mention plaintiff's "multitude of complaints and grievances," also indicates that the reason for plaintiff's termination was her refusal to accept defendant's determination on those complaints and grievances and her "combative manner" in addressing these issues [*See* Doc. 58-1, p. 3]. Thus, this statement also has more than one plausible interpretation and would require a significant inference on the Court's part to determine that it was direct evidence of retaliatory motive. *See Gizzard*, 2021 WL 3269955, at *17. Nevertheless, the Court does find that Sallee's interrogatory response provides at least some circumstantial evidence of a causal connection, given that it references the filing of a "multitude of complaints and grievances" and continued lodging of "baseless complaints" [*See* Doc. 58-1, p. 3]. Viewing this evidence in the light most favorable to plaintiff, the Court finds that this interrogatory response, combined with other evidence discussed below, is sufficient to establish a genuine issue of material fact as to the causal connection requirement.

In addition to Sallee's statements, plaintiff points to three other pieces of evidence to support a showing of a causal connection: (1) the temporal proximity between her protected activity and her termination; (2) Turpin's testimony that she was instructed not to schedule plaintiff; and (3) McClain's testimony that she was informed plaintiff was not returning to Roane Academy.

First, standing alone, temporal proximity "between the protected act and the discharge is not sufficient to establish a causal relationship" for purposes of a TPPA claim. *Smith*, 730 F. Supp. 2d at 800 (quoting *Mason v. Seaton*, 942 S.W.2d 470, 473 (Tenn.

1997)) (internal quotation marks omitted). However, the Court may consider temporal proximity, combined with other circumstantial evidence, in evaluating whether plaintiff has established a causal connection for purposes of her prima facie case. In this case, the record reflects that plaintiff first engaged in protected activity on September 9, 2019, by e-mailing a list of complaints to Green [Doc. 52, pp. 269–71]. Plaintiff then repeatedly followed-up on her complaints in late October and early November [*Id.* at 291–92, 296–97, 308–09]. Plaintiff was ultimately terminated on November 12, 2019 [*Id.* at 311]. Although plaintiff's ultimate termination was somewhat temporally separated from her initial complaint, it did occur within a short time after plaintiff began following up on her initial complaint and requesting a response. Accordingly, the Court finds that the temporal proximity between plaintiff's follow-up requests and her termination could support a finding of causal connection in this case. The Court concludes that the evidence of temporal proximity, combined with Sallee's interrogatory response, and other evidence discussed below, is sufficient to establish a genuine issue of material fact as to the causal connection requirement.

Second, in her deposition, Turpin testified that, in the fall of 2019, before plaintiff was terminated, she was told by certain management employees not to schedule plaintiff and, if plaintiff came in looking to work, to tell her that there was no work available [Doc. 58-5, p. 10]. Defendant argues that this testimony does not establish a causal connection, because Green never told Turpin not to schedule plaintiff for work, but instead, told Turpin that if plaintiff showed up while issues were ongoing, to let her know that there

21

was no work available [Doc. 63, pp. 4–5].  But Turpin's testimony was that she was "told not to schedule [plaintiff] or . . . to tell her we didn't need her[] if she was to walk in" [Doc. 58-5, p. 10].  The Court finds that this testimony provides additional circumstantial evidence that, combined with the evidence discussed above, creates a genuine issue of material fact as to the causal connection requirement.

Finally, McClain testified in her deposition that she was told by "whoever [she] asked" that plaintiff was not coming back to work at Roane Academy [Doc. 58-6, p. 5]. The Court does not find that this testimony could support a finding of a causal connection between plaintiff's complaints and her termination.  McClain provides no timeline for when she was informed that plaintiff was not returning to work, and such statements could have occurred after plaintiff's termination.  Moreover, even if McClain was told that plaintiff was not returning to Roane Academy prior to plaintiff's termination, such is not indicative that the reason defendant did not intend for plaintiff to return to work was her complaints.  Thus, the Court does not find that this evidence supports a finding of a causal connection in this case.

Nevertheless, in light of all the evidence discussed, and viewing such in the light most favorable to plaintiff, the Court finds that a genuine issue of material fact exists as to whether there was a causal connection between plaintiff's protected activity and her termination.  Therefore, a genuine issue of material fact exists as to whether plaintiff can establish a prima facie case under the TPPA.

## 2.    Legitimate, Non-Retaliatory Reasons

Because there is a genuine issue of material fact as to whether plaintiff can establish a prima facie claim under the TPPA, for summary judgment purposes, the burden now shifts to defendant to establish a legitimate, non-retaliatory reason for plaintiff's termination.  Defendant has set forth three separate reasons for plaintiff's termination: (1) plaintiff's failure to cooperate with an investigation into her grievances; (2) plaintiff's failure to respond to whether she would like to continue providing PRN services; and (3) Jenkins's written statement about plaintiff's text messages [*See* Doc. 53, p. 17].  The Court finds that defendant has submitted sufficient evidence, even when viewed in the light most favorable to plaintiff, that defendant had these legitimate, non-retaliatory reasons for plaintiff's termination.

At this stage, "[t]he employer's burden of production . . . is affected by the causation requirement for a TPPA retaliation claim," namely, that "plaintiff must ultimately establish that retaliation is the 'sole' reason for the termination of h[er] employment."  *Williams*, 465 S.W.3d at 115.  Thus, at this stage, the defendant employer "need not proffer evidence that unlawful retaliation was no part of its decision to terminate employment," but instead, "need only introduce admissible evidence showing that unlawful retaliation was not the *sole* cause of the employment action."  *Id.* (emphasis in original).  In other words, "the employer must proffer evidence that, even if retaliation was *a* motivation for the discharge, there was at least one non-retaliatory reason as well."  *Id.* (emphasis in original).  Moreover, "[b]ecause retaliatory discharge is an exception to the employment-at-will doctrine, the

employer's proffered non-retaliatory reason for discharging the employee need not be a sound one; it need only be a reason *other than* retaliation. *Id.* (emphasis in original).

First, in his declaration, Sallee stated that one reason for plaintiff's termination was that she refused to communicate with Green about the investigation into her complaints [Doc. 52, pp. 228–29]. Evidence submitted supports the facial validity of this purported ground for termination. On September 9, 2019, plaintiff e-mailed her concerns to Green [*Id.* at 268–71]. On September 13, Green responded that he had received plaintiff's e-mail and asked to set up a time to discuss [*Id.* at 277–78]. Later that day, Green e-mailed plaintiff recounting that she had previously scheduled a call to discuss her concerns, but later stated she was unable to discuss due to her work schedule [*Id.* at 277]. Green asked plaintiff about rescheduling and stated he was "extremely interested" in discussing plaintiff's concerns [*Id.*]. On September 14, plaintiff responded that she had been "counseled to hold off on having a formal meeting with [Green]" by "our legal team," but stated that she would follow-up on September 17, via e-mail, "to let [Green] know if our meeting will proceed" [*Id.*]. On September 19, Green e-mailed plaintiff stating that he had not received further correspondence from her, but that he was still "interested and available" to speak to her [*Id.* at 281]. Plaintiff did not respond to Green until October 30, at which point she asked for corporate contact information [*Id.*]. On November 7, Green forwarded this e-mail to Ford, expressing frustration that he had repeatedly attempted to discuss these issues with plaintiff but she "never calls or reschedules" [*Id.*]. In light of this

24

evidence, the Court finds that the record establishes that defendant has this legitimate, non-retaliatory basis for terminating plaintiff.

Second, in his declaration, Sallee stated that another reason for plaintiff's termination was her failure to respond to Green regarding her intent to continue providing PRN services [*Id.* at 228–29]. In his September 19, e-mail, Green inquired whether plaintiff still wished to remain on PRN status at Roane Academy, noting that plaintiff had previously stated that she loved working at Roane Academy, but also noting that plaintiff worked another full-time job and had "been advised by [her] legal team not to have contact with YOI" [*Id.* at 281]. Plaintiff admits that she did not respond to Green's question about continuing to provide PRN services at Roane Academy [*Id.* at 256]. In light of this evidence, the Court finds that the record establishes that defendant also had this legitimate, non-retaliatory basis for terminating plaintiff.

Third, in his declaration, Sallee stated that another reason for plaintiff's termination was that, seven days prior, Jenkins had submitted a written statement that plaintiff had sent her threatening and inappropriate messages, as well as a screenshot containing confidential information [*Id.* at 228–29]. The record shows that Jenkins filed a report on November 5, stating that she and plaintiff had been professional friends for several months, but plaintiff had sent Jenkins "threatening and inappropriate text messages" and a screenshot of confidential information from a program on Jenkins's computer [*Id.* at 339–40]. Jenkins described plaintiff's text messages as attempting "to create a hostile work environment"

25

[*Id.* at 340].  In light of this evidence, the Court finds that defendant had this third legitimate, non-retaliatory reason to support plaintiff's termination.

As noted previously, at this stage, "[t]he employer's burden of production . . . is affected by the causation requirement for a TPPA retaliation claim," namely, that "plaintiff must ultimately establish that retaliation is the 'sole' reason for the termination of h[er] employment."  *Williams*, 465 S.W.3d at 115.  The Court finds that, even viewing the evidence in the light most favorable to plaintiff, there is no genuine issue of material fact as to whether defendant has shown that there were legitimate, non-retaliatory reasons that supported plaintiff's termination.

### 3.    Pretext

Because defendant has established that there is no genuine issue of material fact as to whether it had legitimate, non-retaliatory reasons for plaintiff's termination, the burden shifts back to plaintiff to show that these proffered reasons are pretextual.  *See Smith*, 730 F. Supp. 2d at 797.  At this stage, the question becomes "whether the plaintiff has established that it is more likely than not that the employer's proffered reason is mere pretext and thus a coverup for the employer's true retaliatory motive."  *Williams*, 465 S.W.3d at 118 (internal quotation marks omitted).  In making this determination, the Court must consider, as a whole, any evidence that "exposes the weakness, implausibility's, inconsistencies, incoherencies, or contradictions" in the defendant's proffered explanations.  *Id.* (internal quotation marks omitted).

26

Pretext is typically shown: "(1) by establishing that the employer's proffered reasons have no basis in fact, (2) by establishing that the proffered reasons did not actually motivate the discharge, or (3) by establishing that they were insufficient to motivate the discharge." *Id.* at 119. The first way of establishing pretext "is accomplished by showing that the proffered reason is based on facts that are not true" which "calls into question the reasonableness of the employer's decision." *Id.* Under the second method, a plaintiff "may either produce evidence that the adverse employment decision was more likely motivated by retaliation or 'show that the employer's explanation is not credible.'" *Id.* Under the third method, "the employee must produce evidence that other employees who engaged in substantially the same non-protected conduct were not fired." *Id.*

Because plaintiff bears the burden of establishing that retaliation was the *sole* reason for her termination, she must show that *all* of the proffered reasons discussed above are pretextual. *See generally, Treadway*, 611 F. Supp. 2d at 783 (stating that, under the TPPA, plaintiff must establish that retaliatory motive was the sole reason for termination). The Court will address plaintiff's arguments regarding each of the proffered reasons in turn.

### a.    Contemporaneous Statement

Plaintiff argues that several of defendant's proffered reasons for her termination are pretextual because they were not offered contemporaneously [Doc. 58, pp. 14, 19–20]. The Sixth Circuit has acknowledged that "the lack of contemporaneous statements to support a defendant's rationale can show pretext[.]" *Choices in Community Living, Inc. v. Petkus*, 517 F. App'x 501, 506 (6th Cir. 2013). However, as the Court has noted, plaintiff was

27

provided a generalized explanation for her termination, that the company believed that such was in the best interests of providing a certain level of service [Doc. 52, p. 311], and all of the reasons now presented could be deemed to fall within that general explanation. Moreover, there is evidence in the record that the reasons now cited for plaintiff's termination were discussed among management contemporaneously. For example, in forwarding plaintiff's e-mails to Ford, Green expressed frustration about repeated attempts to discuss plaintiff's concerns, and her refusal to discuss the matter with him [*Id.* at 281]. Similarly, after plaintiff admittedly did not respond to Green's question about her desire to remain on PRN status at Roane Academy [*id.* at 256], Sallee contemporaneously expressed concerns to plaintiff about her desire to continue working there [*Id.* at 305, 309]. And, members of the legal department received and discussed Jenkins's written statement about her interactions with plaintiff a few days before plaintiff's termination [*Id.* at 5, 350]. Accordingly, the Court finds that there is no lack of contemporaneous evidence that would support a finding of pretext.

### b. Failure to Respond to Green's Communications

Plaintiff further argues that Green fabricated a reason not to talk to her [Doc. 58, p. 15]. She argues that it was not unreasonable for her to heed Jenkins's warning about speaking to Green alone, and also states that Green never stated that he was investigating her complaints or needed her to answer investigatory questions [*Id.*]. She also argues that Green directed plaintiff to Ford, claiming that she would not discuss her grievance with him, but this was the main topic of her October 30, e-mail [*Id.* at 16]. Moreover, plaintiff

28

argues that Green then claimed he could not discuss matters with her because she had stated she had a legal team, but he had previously expressed interest in speaking to her, even after her mention of a legal team [*Id.*]. Plaintiff further contends that she responded to Green about her continued employment through her October 30, e-mail asking about training and credentials [*Id.* at 17].[7]

Defendant, however, argues that plaintiff cannot blame Jenkins for her failure to communicate with Green, as the record only indicates that Jenkins told plaintiff not to talk to Green alone, not that she should not e-mail Green [Doc. 63, p. 7].

As to Jenkins's advice regarding communications with Green, plaintiff admitted in her deposition that she never shared with Green her concerns or her desire to keep communication via e-mail [Doc. 52, p. 255]. Accordingly, defendant had no way to know

---

[7] The Court notes that plaintiff argues that defendant's claim that she did not want to return to work is not supported by the record [Doc. 58, p. 16]. However, the Court does not construe defendant's asserted legitimate non-retaliatory reasons to include that plaintiff did not want to return to work. Rather, the Court has construed one of defendant's legitimate non-retaliatory reasons as plaintiff's failure to respond to Green's questions about her desire to return to work.

However, even to the extent that defendant's proffered reason could be construed as asserting that plaintiff did not want to work generally, the Court finds that the evidence does not support a finding that this explanation is pretextual. Throughout her communication with management in October and November, while plaintiff asked about training and work schedules, she also repeatedly expressed concern about returning to work until management provided her with a written response to her complaints and provided some unspecified accommodations to ensure she was not retaliated against [Doc. 52, pp. 288–89, 291, 294–95, 306, 309]. In fact, several days before her termination, plaintiff told Sallee that she wanted to come back to working in a position that would be part-time at home because she could not "ensure the conditions that's going on now without the help of senior management" [*Id.* at 308].

In light of these statements, it appears plaintiff continually expressed hesitance to return to her position as a PRN youth specialist, and thus, the Court does not find evidence to create a genuine issue of material fact as to a claim that this potential reason for plaintiff's termination is pretextual.

29

of plaintiff's reservations about speaking to Green. Moreover, plaintiff's concern that Green would misrepresent her statements does not explain why she could not have asked Green to detail his questions about her complaint in writing, nor her failure to respond via e-mail about her intent to continue working at Roane Academy. Thus, regardless of whether it was reasonable for plaintiff to heed Jenkins's advice, given the lack of knowledge defendant had about this concern, plaintiff's argument does nothing to indicate that this explanation for her termination is pretextual.

Next, plaintiff's claim that Green came up with a fictitious reason not to speak to her is belied by the record. Plaintiff directly told Green that she had been advised by a "legal team" not to discuss her complaints with YOI [*Id.* at 277]. Nevertheless, even after this statement, Green told plaintiff that he was still available and interested in discussing her concerns [*Id.* at 281]. But plaintiff still refused to respond to Green's attempts to discuss plaintiff's concerns. And, the Court finds no evidence of an October 30, e-mail responding to Green about discussing plaintiff's complaints or her intent to remain at Roane Academy. Instead, on October 30, plaintiff merely asked Green for contact information for corporate management [*Id.*]. While plaintiff also e-mailed Turpin, and then, at Green's instruction, Ford, inquiring about maintaining her PRN status, she also repeatedly expressed hesitance to return to Roane Academy [*Id.* at 295–97, Doc. 58-3, p. 13, Doc. 5-10, p. 2]. Accordingly, plaintiff's October 30, e-mails still did not respond to Green's attempts to discuss plaintiff's complaints and remained unclear regarding her

intent to return to Roane Academy, and therefore, this evidence does not create a genuine issue of material fact as to pretext.

Finally, the Court does not find that Green's failure to specifically use the term "investigate" is indicative of pretext. Green, the recipient of plaintiff's September 9, e-mail, listing her complaints, repeatedly contacted plaintiff, explicitly stating that he wanted to discuss her concerns [Doc. 52, pp. 277–78, 281]. But, instead of agreeing to discuss her concerns, whether in a phone call, in a meeting, or via e-mail, plaintiff continued to ignore Green's attempts at communication. And plaintiff's intent to ignore Green is clear from her text message to Jenkins in which she referred to Green as a "fool" for continuing to contact her [*Id.* at 126, 244].

In sum, the Court finds that there is no genuine issue of material fact as to whether plaintiff can meet her burden of establishing that defendant's proffered reasons for her termination relating to her failure to communicate with Green are pretextual. Accordingly, each of these proffered reasons—that plaintiff refused to discuss her complaints with Green for further investigation and that plaintiff refused to respond to Green's inquiry about her intent to return to work—provide a separate and independent ground for dismissal of plaintiff's TPPA claim, as there is no genuine issue of material fact as to whether retaliation was the sole reason for her termination.

### c.   Jenkins's Statement

As to Jenkins's written statement, plaintiff explains that she was angry with Jenkins over a family matter, and the screenshot containing confidential information is actually a

photograph of Jenkins's cell phone open to a confidential database in Moore's attorney's office [Doc. 58, pp. 18–19]. She asserts that Jenkins was clearly the one who had shared the confidential information, as she was the only one with access, but Jenkins was not fired [*Id.* at 19].

Defendant, however, argues that, confidentially issues aside, plaintiff's termination occurred a week after a co-worker complained about plaintiff sending "threatening and inappropriate text message[s]" and creating "a hostile work environment" [Doc. 63, p. 8].

Although plaintiff contests who shared confidential information, putting this dispute aside, the information defendant had at the time of its decision to terminate plaintiff's employment was that Jenkins had submitted a written complaint about plaintiff both sending "inappropriate and threatening messages" which she described as intending to create "a hostile work environment" and sharing confidential information, with screenshots to support the complaint [Doc. 52, pp. 339–42]. But plaintiff limits her arguments to the confidential information portion of Jenkins's complaint and does not address the inappropriate and threatening text messages. Thus, plaintiff has presented no evidence or argument suggesting that the inappropriate and threatening text messages could not have sufficed as a ground for her termination. And common sense suggests that such behavior, directed at a co-worker, could reasonably support termination of an employee. Accordingly, the Court finds no genuine issue of material fact as to whether plaintiff can meet her burden of establishing that this proffered reason for her termination is pretextual. Therefore, on this alternate ground, plaintiff's TPPA claim must be dismissed.

#### d. Entirety of Evidence

Plaintiff also contends that the entirety of the evidence establishes pretext [Doc. 58, p. 19]. But, at this stage, plaintiff bears the ultimate burden of establishing that retaliatory motive was the sole basis for her termination. *See Smith*, 730 F. Supp. 2d at 797. For the reasons discussed, above, the Court finds that plaintiff has not pointed to any evidence on the record to meet this burden.

Accordingly, for all the reasons explained, the Court finds that no genuine issue of material fact exists as to plaintiff's TPPA claim. Therefore, defendant's motion for summary judgment is **GRANTED** on this ground and plaintiff's TPPA claim is **DISMISSED**.

### B. Common Law Claims

Next, defendant argues that the TPPA was amended on July 1, 2014, to eliminate common law causes of action based on the same set of facts as a TPPA claim [Doc. 53, p. 18]. Accordingly, defendant contends that plaintiff's common law claims are abrogated and superseded by the TPPA [*Id.*].

Plaintiff responds that her common law claims are not abrogated or superseded because they are pled in the alternative [Doc. 58, p. 20]. She notes that courts have found alternative pleading is permissible [*Id.* at 21].

The Tennessee General Assembly "unquestionably has the constitutional and legislative authority" to abrogate Tennessee common law claims, but "it must make clear its intention to do so." *State v. Howard*, 504 S.W.3d 260, 270 (Tenn. 2016). In 2014,

33

Tennessee amended the TPPA to "abrogate[] and supersede[] the common law with respect to any claim that could have been brought under [that] section." Tenn. Code Ann. § 50-1-304(g); *see Williams*, 465 S.W.3d at 110 n.11. The Tennessee Supreme Court has explained that "under the statute as amended, in cases in which the plaintiff alleges retaliatory discharge for refusing to participate in illegal activities or for refusing to remain silent about illegal activities, *the TPPA is the exclusive basis for relief*." *Williams*, 465 S.W.3d at 110 n.11 (emphasis added). In light of this, the Western District of Tennessee has concluded that a plaintiff's common law retaliatory discharge claim, brought in addition to a TPPA claim, necessarily failed "because the 2014 amendments to the relevant section of the TPPA expressly abrogated common law retaliatory discharge claims for refusing to remain silent about illegal activities." *Harris-Anderson v. Quince Nursing & Rehab. Ctr., LLC*, No. 2:19-CV-2032, 2020 WL 4506803, at *6 (W.D. Tenn. Aug. 5, 2020). Under the plain language of the TPPA, as amended, and in light of the case law since the 2014 amendment, it appears clear that the TPPA abrogates any common law retaliatory discharge claim for refusal to remain silent about illegal activities in Tennessee.

In her response, plaintiff appears to misunderstand the matter at hand. The issue is not whether it is permissible for plaintiff to plead alternative grounds for relief, the issue is whether the common law retaliatory discharge claim remains a viable claim that could be pled at all after the 2014 amendment to the TPPA. In light of the TPPA's plain language, and the case law cited above, the Court concludes that such common law claim is no longer viable, and therefore, whether pled in the alternative or not, the common law retaliatory

34

discharge claim cannot survive. Accordingly, defendant's motion for summary judgment on plaintiff's common law retaliatory discharge claim is **GRANTED** and plaintiff's common law retaliatory discharge claim is **DISMISSED**.

### C.    Punitive Damages

Defendant next argues that plaintiff cannot establish by clear and convincing evidence that defendant acted intentionally, fraudulently, maliciously, or recklessly in its treatment of her, as required for punitive damages [Doc. 53, p. 20]. Specifically, defendant contends that plaintiff cannot show that it acted with intent to injure her, as it attempted on multiple occasions to investigate her complaints, but she was uncooperative and refused to return to work or advise defendant of her plans [*Id.*]. Moreover, defendant argues that it did not act recklessly because it had an "Open Door Policy" to address the very type of concerns raised by plaintiff [*Id.* at 21].

Plaintiff responds that a reasonable jury could find that punitive damages are appropriate [Doc. 58, p. 21]. Specifically, she contends that a jury could find it egregious to retaliate against an employee for reporting alleged sexual abuse of minors and violations of public policy protecting minor children from neglect and abuse through poor conditions [*Id.* at 22].

In Tennessee, "[a] verdict imposing punitive damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly." *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 531 (Tenn. 2008). Punitive damages are "intended to punish a defendant, to deter him from committing acts

35

of a similar nature, and to make a public example of him and are appropriate only in the most egregious cases." *Beal ex rel. Putnam v. Walgreen Co.*, 408 F. App'x 898, 903 (6th Cir. 2010) (internal quotation marks omitted). "[E]vidence is clear and convincing when it leaves no serious or substantial doubt about the correctness of the conclusions drawn." *Flax*, 272 S.W.3d at 531 (internal quotation marks omitted).

While punitive damages are generally "a subjective matter specially suited for jury determination . . . it is not improper to dispose of punitive damage liability on summary judgment." *Vogt v. Emerson Elec. Co.*, 805 F. Supp. 506, 512 (M.D. Tenn. 1992). At the summary judgment stage, "'[a] submissible punitive damages claim has been made if the evidence and the inferences reasonably drawn from the evidence are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity that the defendant's conduct that caused the plaintiff's injury was intentional, fraudulent, malicious, or reckless.'" *Beal*, 408 F. App'x at 903 (quoting *Duran v. Hyundai Motor Am. Inc.*, 271 S.W.3d 206, 207 (Tenn. Ct. App. 2008)).

"A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). "A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation." *Id.* "A person acts maliciously when the person is motivated by ill will, hatred, or personal spite." *Id.* "A person acts recklessly when the

36

person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Id.*

Notably, plaintiff does not specify whether she contends defendant acted intentionally, fraudulently, maliciously, or recklessly in its actions. In her amended complaint, plaintiff merely states that defendant's actions "were done maliciously, intentionally, fraudulently and/or recklessly" [Doc. 35, p. 15]. And, in her response to the summary judgment motion, she fails to address this framework, instead, merely contending that defendant's actions were "egregious" [Doc. 58, pp. 21–22].

Ultimately, the Court finds that there is no genuine issue of material fact as to whether plaintiff can meet the high burden of establishing by clear and convincing evidence her entitlement to punitive damages. It appears that there are two injuries upon which plaintiff could base a claim for punitive damages: (1) her 2018 termination; and (2) the 2020 recension of her offer of re-employment. There is no evidence, or even any particularized suggestion, that defendant acted fraudulently or maliciously in either of these actions.

Moreover, while the Court declines to opine on the ultimate strength of any remaining retaliation claims, the Court finds that no genuine issue of material fact exists as to whether plaintiff can establish by clear and convincing evidence that defendant took either of these actions against plaintiff with intent to retaliate against her for protected activity, such that defendant's actions could be deemed egregious. As to plaintiff's

37

termination, as described above, defendant has set forth several legitimate non-retaliatory reasons to support the termination. And, while circumstantial evidence remains which may or may not establish that defendant had retaliation as a motive for plaintiff's termination and/or recension of offer of re-employment, the Court finds there is simply insufficient proof in the record that could establish by clear and convincing evidence that defendant acted intentionally for purposes of punitive damages. Further, the Court specifically points to no evidence to support such assertion, which is fatal on summary judgment. *See Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995) ("a motion for summary judgment is a means by which to 'challenge the opposing party to 'put up or shut up' on a critical issue'").

Similarly, the Court does not find any genuine issue of material fact as to whether defendant acted recklessly regarding plaintiff's participation in protected activity. Notably, defendant included an open-door policy in its employee handbook, specifically to address concerns of retaliation for engaging in protected activity [Doc. 52, p. 298]. And, as the Court has already explained, defendant repeatedly attempted to discuss plaintiff's concerns with her, but she refused to respond or cooperate with investigative efforts. Accordingly, the Court finds no genuine issue of material fact as to whether defendant acted recklessly with regard to plaintiff's protected activity such that its conduct could be deemed egregious.

For these reasons, the Court finds that there is no genuine issue of material fact as to whether plaintiff can establish that defendant acted intentionally, fraudulently,

maliciously, or recklessly, such that its conduct could be deemed egregious. Therefore, defendant's motion for summary judgment on this ground is **GRANTED** and plaintiff's claims for punitive damages are **DISMISSED**.

The Court also notes that defendant has moved for a bifurcated trial, asking the Court to bifurcate the matters of liability and punitive damages [Doc. 62]. However, in light of the Court's dismissal of plaintiff's claims for punitive damages, this request is now moot. Accordingly, the motion to bifurcate [Doc. 62] is **DENIED as moot**.

### D.    After-Acquired Evidence Defense

Defendant argues that the after-acquired evidence rule generally bars a plaintiff from receiving front or back pay when an employer learns, once into the case, that she engaged in other, previously unknown, wrongful conduct that would have been a further basis for discharge [Doc. 53, p. 22]. Defendant contends that plaintiff's August 3, 2018, letter contains a misrepresentation about her criminal history, and if defendant had known about that misrepresentation, it would not have hired plaintiff in 2018, nor reinstated her in 2020 [*Id.* at 23].

Plaintiff responds that the after-acquired evidence defense does not bar recovery [Doc. 58, p. 22]. She argues that when she was informed in 2018 of prior charges for "larceny," she misheard, and instead responded regarding prior charges for "arson" [*Id.*]. She states it is clear that she left the last digit on the first date and the entire year on the second date blank because she did not know the dates [*Id.* at 22–23].

39

Defendant replies that, in addition to the larceny/arson issue, plaintiff failed to mention in her statement that she had been charged with stealing hubcaps in Anderson County in 1999 [Doc. 63, p. 11]. Defendant states plaintiff has pointed to no authority that the after-acquired evidence defense is not applicable because the evidence at issue was discovered after an employee's application [*Id.*].

"The after-acquired evidence doctrine is an affirmative defense which bars 'an employee from obtaining certain remedies in a discrimination case' if 'an employer can show that it would have been entitled to terminate the employee for severe wrongdoing, if it had known of the employee's wrongdoing at the time[.]'" *Day v. Finishing Brands Holdings, Inc.*, No. 13-1089, 2015 WL 2345279, at *31 (W.D. Tenn. May 14, 2015) (alteration in original). "As a general rule, under the after-acquired evidence doctrine, the back pay award is limited and the employee is barred from obtaining front pay and reinstatement." *Id.* "When an employer seeks to rely on after-acquired evidence of wrongdoing, it must establish first, that the wrongdoing in fact occurred, and second, that the wrongdoing was of such severity that the employee in fact would have been terminated." *Id.*

Here, the Court finds a genuine issue of material fact exists as to whether the alleged wrongdoing would have resulted in plaintiff's termination, had defendant learned of it previously. Although Sallee testified that defendant would have terminated plaintiff if it knew of the misrepresentation earlier [Doc. 52, p. 229], plaintiff also provides some explanations that could mitigate any wrongdoing on her part. Specifically, plaintiff

40

acknowledged that it was a "mistake" to state that she was a minor in 1997 and 1999, but she also states that she was not provided with the specific dates when she wrote her 2018 letter, and the dates were later written in [*Id.* at 266; Doc. 58-8, p. 3]. And, in fact, the typewritten letter does appear to have the dates of 1997 and 1999 handwritten into the relevant section [Doc. 52, p. 219]. Moreover, as to her Anderson County charge, plaintiff explains that, in 2018, she wrote the letter to address specific topics that she was asked to address by Turpin, and the Anderson County charge was not among the topics she was asked to address [*Id.* at 266].

Given this evidence, the Court finds that a genuine issue of material fact exists as to whether plaintiff's misrepresentation of her criminal history would have resulted in her termination, had defendant known of it previously. Accordingly, defendant's motion for summary judgment on this ground is **DENIED**.

## IV. Conclusion

For the reasons set forth above, defendant's motion for partial summary judgment [Doc. 50] is **GRANTED in PART and DENIED in part**. Plaintiff's claims under the TPPA, Tennessee common law, and for punitive damages are **DISMISSED**. Defendant's motion for bifurcation [Doc. 62] is **DENIED as moot**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

41